## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

DEBORAH L. KOTCHOU,      )
        Plaintiff,       )
                  )
    v.               )
                  )     CASE NO.: 2:11-CV-438 JVB
MICHAEL J. ASTRUE,       )
Commissioner of Social Security  )
Administration,         )
        Defendant.     )

## OPINION AND ORDER

Plaintiff Deborah Kotchou seeks review of the final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1382c(a). Plaintiff asks the Court to reverse the Commissioner's decision and remand the case for further proceedings. For the following reasons, the Court grants Plaintiff's request for remand.


**A. Procedural Background**

On March 16, 2007, Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423(d)(2), and SSI alleging that she became disabled on November 30, 1998, due to severe back problems, vision loss, and depression. (R. 220-22, 228-31, 149, 154.) Plaintiff's concurrent applications were initially denied on July 12, 2007, as was her request for reconsideration on April 4, 2008. (R. 132-36, 137-41, 146-49, 151-54.)

On November 19, 2009, Administrative Law Judge ("ALJ") Marlene Abrams held a hearing at which Plaintiff, a medical expert, and a vocational expert testified. (R. 38-127.) At the administrative hearing, Plaintiff moved to dismiss her DIB claim and also amend her alleged

disability onset date to February 11, 2007, which is the date she asserts she lost vision in her left eye.

(R. 43-44.) On March 26, 2010, the ALJ issued a decision finding Plaintiff not disabled and denying

her claims for DIB and SSI. (R. 21-32.) In denying Plaintiff's claims, the ALJ found:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2003.

2. The claimant has not engaged in substantial gainful activity since February 11, 2007, the amended alleged onset date . . . . (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, and blindness in the left eye due to trauma (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record . . . . the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant can never climb ladders, ropes, or scaffolds; the claimant can occasionally climb ramps or stairs; the claimant must avoid even moderate use of moving machinery; and avoid even moderate exposure to unprotected heights; the claimant is limited to occupations requiring no depth perception; and only occasional field of vision.

6. The claimant is capable of performing past relevant work as a secretary. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 11, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(R. 23-32.)

On October 6, 2011, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3.) Plaintiff now requests judicial review of the ALJ's March 26, 2010, decision denying her SSI claim.[1]

## B. Factual Background

### (1) *Plaintiff's Background*

Plaintiff was born on December 11, 1957, and was 52 years old when the ALJ issued her decision. (R. 43, 46, 228.) She has a high school education and previously held jobs as a cashier, receptionist, and secretary. (R. 43, 84-85, 264.)

### (2) *Medical Evidence*

### a. Physical Health

Beginning in 1996, Plaintiff was treated by Dr. Marc Levin, a neurosurgeon, for lower back pain that radiated to her right leg. (R. 500.) At that time, she received lumbar epidural steroid injections, which provided her with significant pain relief. *Id.* Several years later, in November 1999, Plaintiff reported to Dr. Levin that she had lower back pain that radiated to her right hip, buttock, thigh, leg, and foot. *Id.* As a result, she had another series of epidural steroid injections. (R. 501-03.) That same month, Plaintiff underwent diagnostic testing; an MRI of the lumbar spine indicated mild acquired stenosis of the central spinal canal at the L4-L5 disc level and mild diffuse posterior disc bulging at the L4-L5 level. (R. 507.)

_____

[1] While the ALJ specifically denied both Plaintiff's DIB and SSI claims, she cites only her SSI claim as the basis for judicial review. (Pl.'s Br. at 1-2.) Because Plaintiff does not reference or discuss her DIB claim in her brief and she specifically moved to withdraw her DIB claim at the administrative hearing, the Court's review entails only Plaintiff's SSI claim. (R. 43-44.)

In April 2001, Plaintiff again sought treatment for her lower back pain and had another MRI of her lumbar spine. (R. 506.) The MRI showed degenerative disc disease at the L4-L5 and L5-S1 disc levels, but there was no spinal stenosis or significant change since the November 1999 study. *Id.* A subsequent MRI performed in September 2002 confirmed Plaintiff's degenerative disc disease, which was accompanied by generalized disc bulging and mild hypertrophy. (R. 496.) Two months later, in November 2002, treatment notes indicate that Plaintiff would undergo a third series of epidural steroid injections for her lower back pain. (R. 492-94.) At that time, Plaintiff was assessed with lumbar degenerative disc disease with lower back pain and radicular type extremity pain. (R. 494, 495.)

Almost five years later, in February 2007, Plaintiff was initially treated in the emergency room after she was poked in her eyes during an assault. (R. 345-46, 354-55, 375-75, 466.) Because her left eye globe had been ruptured, she was transferred to another hospital for surgery. (R. 348.) Dr. Jeremy Keenan, an ophthalmologist and surgeon, performed a surgical repair of the open globe rupture of Plaintiff's left eye. (R. 381-83.) A month later, in March 2007, Dr. Michael Blair, a second ophthalmologist and surgeon, repaired a retinal detachment in the same eye. (R. 377-79, 384-88.) Subsequent to the surgery, Dr. Blair treated Plaintiff on an outpatient basis. (R. 452-61.)

In June 2007, Dr. M.S. Patil, a licensed physician for the Social Security Administration ("SSA") Disability Determination Bureau, conducted a consultative evaluation of Plaintiff. (R. 485-88.) Dr. Patil's evaluation documents that Plaintiff sustained an injury to her left eye and, as a result, she has no vision in that eye. (R. 485.) He noted that Plaintiff had two surgeries on her left eye and was scheduled to undergo left eye corneal transplant surgery in July 2007. *Id.* Dr. Patil further indicated that Plaintiff suffered from degenerative disc disease of her spine and complained

of constant mild to moderate pain in her lower back. *Id.* Dr. Patil examined Plaintiff and found that she walked normally in his office without bumping into objects or holding on to the wall. (R. 487.) She had a full range of motion in all of her joints, and her gait, speech, hand dexterity, and motor strength were normal. *Id.* However, Dr. Patil found Plaintiff's flexion, extension, and lateral flexion of her lumbar spine were limited and she had positive straight leg raising at 30 degrees bilaterally. *Id.*

A month later, in July 2007, Dr. Charles Kenney, a non-examining state agency physician, reviewed Plaintiff's medical file and completed a Physical Residual Functional Capacity ("RFC") Assessment form. (R. 513-20.) Dr. Kenney opined that Plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull without limitation. (R. 514.) He also determined that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, frequently balance, kneel, and crawl, and occasionally stoop and crouch. (R. 515.) Dr. Kenney documented Plaintiff's visual deficits regarding her left eye, which included limitations in her visual acuity (near and far), depth perception, accommodation, and field of vision. (R. 516.) Furthermore, he noted that Plaintiff has "light perception only" in that eye. *Id.*

In September 2007, Dr. Blair and Dr. Janet Lee, a third ophthalmologist, performed corneal transplant surgery and repaired another retinal detachment. (R. 619-24.) Subsequent to the surgery, in a November 2007 progress note, Dr. Lee noted that Plaintiff could only see shadows out of her left eye. (R. 443.)

About four months later, in January 2008, Dr. Stanley Rabinowitz, a licensed physician for the SSA Disability Determination Bureau, performed a consultative evaluation of Plaintiff. (R. 539-

42.)  Dr. Rabinowitz noted Plaintiff's history of impaired vision and, as a result, she could only occasionally "make out shadows and light and dark with the left eye but not always."  (R. 539.)  He indicated that Plaintiff had a history of depression, but she had not been formally evaluated for this condition.  *Id.*  Dr. Rabinowitz documented Plaintiff's complaint regarding her constant lower back pain, which she described as radiating down her right leg into her foot with her pain averaging an "8" on a scale of one to 10.  (R. 539-40.)  He attributed her back pain to degenerative disc disease and noted she took medication for her pain symptoms.  *Id.*

Dr. Rabinowitz conducted a physical examination of Plaintiff.  With regard to her vision, he found that Plaintiff's vision in her right eye was 20/20 when corrected with glasses, and her vision in her left eye was greater than 20/100 and could not be corrected.  (R. 540.)  Plaintiff's physical examination indicated she had limitations in her lumbar spine on flexion, extension, and rotation, but her straight leg raising test was negative.  (R. 541.)  Dr. Rabinowitz's assessment of Plaintiff's mental status showed that her memory was intact and her appearance was appropriate.  (R. 542.)  He found she exhibited no behavioral difficulties and was able to properly relate during the examination.  *Id.*  Dr. Rabinowitz assessed Plaintiff with a history of impaired visual acuity and untreated depression, and chronic lumbar spine pain secondary to degenerative disc disease.  *Id.*

In April 2008, Dr. Sandra Bilinsky, a state agency medical consultant, reviewed Plaintiff's medical record and affirmed Dr. Kenney's July 2007 RFC assessment.  (R. 557-59.)  Dr. Bilinsky specifically noted that there was insufficient medical evidence in the record prior to December 31, 2003, the date Plaintiff was last insured for purposes of DIB, to properly adjudicate her claim.  (R. 559.)

A month later, in May 2008, Dr. Lee completed a Vision Impairment RFC Questionnaire. (R. 571-73.) She opined that Plaintiff had poor vision in her left eye, which was secondary to multiple retinal detachments and a prior open globe rupture. (R. 571.) Dr. Lee indicated that Plaintiff could never perform work activities that involve the use of her depth perception, but she could perform activities that required the occasional use of her field of vision. (R. 572.) She assessed Plaintiff as being able to perform work activities requiring the constant use of her visual acuity (near and far), accommodation (ability of the eye to adjust its focus from distant to near objects and vice versa), and color vision. *Id.* She noted that, because Plaintiff lacked depth perception and poor vision in her left eye, she would have difficulty walking up and down stairs and avoiding ordinary hazards in the workplace. *Id.* Dr. Lee also opined that Plaintiff's symptoms would never interfere with her attention and concentration to perform simple work tasks and she would not need to take unscheduled breaks during an eight-hour workday. (R. 573.)

In March 2009, Dr. Blair also completed a Vision Impairment RFC Questionnaire. (R. 574-76.) In the Questionnaire, Dr. Blair described Plaintiff as being "legally blind" in her left eye and being sensitive to light. (R. 574.) He opined that Plaintiff could never perform work activities that involve the use of depth perception and could rarely perform activities involving accommodation of her left eye. (R. 575.) But Dr. Blair indicated that Plaintiff could perform work activities involving the occasional use of her field of vision, frequent use of her visual acuity (near and far), and constant use of her color vision. *Id.* He also explained that she would have difficulty climbing up and down stairs and avoiding ordinary workplace hazards. *Id.* Dr. Blair opined that Plaintiff would occasionally need to take unscheduled breaks during an eight-hour workday for "a few minutes" as a result of "ocular irritation." (R. 576.) Furthermore, Dr. Blair assessed Plaintiff's

prognosis as being poor and indicated her symptoms were severe enough to occasionally interfere with attention and concentration needed to perform even simple work tasks. (R. 574, 576.)

### b. Mental Health

In February 2008, Joseph Mehr, Ph.D., a state agency psychologist, reviewed Plaintiff's medical file and completed a Psychiatric Review Technique form. (R. 543-56.) Dr. Mehr found that there was no medical evidence in the record to substantiate Plaintiff's claim that she suffered from depression because she had neither been diagnosed with depression nor received any type of treatment for depression. (R. 546, 555.) Dr. Mehr determined that Plaintiff's alleged depression did not limit her daily activities and noted she had two consultative evaluations where the results of "mini" mental status examinations were "entirely normal." (R. 555.) Dr. Mehr concluded that Plaintiff did not suffer from any type of mental impairment and her daily activities were impacted by her back pain, stiffness, and left eye blindness, but she could still drive a car and get out and walk. *Id.*

In July 2009, Plaintiff underwent an initial psychiatric evaluation with Dr. Balin Durr. (R. 633-35.) Plaintiff reported to Dr. Durr that she felt depressed and anxious since she lost her sight in her left eye. (R. 635.) At the evaluation, Plaintiff's symptoms included a depressed mood, slowed motor function, anhedonia, decreased appetite, poor concentration, sleep disturbance, and feeling worthless, hopeless, and helpless. (R. 633-34.) Dr. Durr diagnosed Plaintiff as having a major depressive disorder and a generalized anxiety disorder. (R. 633-34.) She assessed Plaintiff with a current Global Assessment of Functioning ("GAF") score of 50 and a GAF score of 60 during

the past year.[2]  (R. 634.)  Dr. Durr prescribed Prozac for Plaintiff's depression and anxiety, and referred her for therapy.  *Id.*

A month later, in August 2009, Plaintiff sought treatment with Dr. Durr on three separate occasions.  (R. 630-32.)  During her first two visits, Dr. Durr noted that Plaintiff had a depressed mood and displayed a constricted affect, but the other aspects of her mental status evaluation were essentially normal.  (R. 631-32.)  During her third visit, Dr. Durr noted that Plaintiff's mood was good, but she still had a constricted affect.  (R. 630.)  She continued to diagnose Plaintiff with major depressive and generalized anxiety disorders and prescribed Trazodone.  *Id.*

In September 2009, Dr. Durr assessed Plaintiff's mental ability to perform work-related activities and completed a Mental Impairment Questionnaire.  (R. 578-83.)  She first described her mental status examination findings, which indicated that Plaintiff's symptoms consisted of a depressed mood, anhedonia, fatigue, psychomotor retardation, weight loss, sleep disturbance, impaired concentration, anxiety, and feeling worthless, helpless, and guilty.  (R. 578-79.)  Dr. Durr then assessed Plaintiff's ability to perform work activities on a day-to-day basis in a regular work setting and determined that she was unable to meet the competitive standards required to do unskilled work in four mental functional areas.[3]  (R. 580.)  In this regard, Dr. Durr opined that Plaintiff was unable to maintain attention for a two hour segment, complete a normal workday and

---

[2]  The GAF includes a scale ranging from zero to 100, and is a measure of an individual's "psychological, social, and occupational functioning."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Tex. Rev. 2000) ("DSM–IV–TR").  A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.  Furthermore, a GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  *Id.*

[3]  An individual is unable to meet competitive standards when she "cannot satisfactorily perform [an] activity independently, appropriately, effectively and on a sustained basis in a regular work setting."  (R. 580.)

workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with normal work stress. *Id.* She also found that Plaintiff was seriously limited, but not precluded in her ability to remember work-like procedures, maintain regular and punctual attendance within customary tolerances, and sustain an ordinary routine without special supervision.[4] *Id.* With respect to semi-skilled and skilled work, Dr. Durr indicated that Plaintiff would also be unable to meet the competitive standards required for this work because she could not understand and remember detailed instructions, carry out detailed instructions, and deal with stress from this type of work. (R. 581.) She further assessed Plaintiff as having marked limitations in performing daily activities and maintaining social functioning, and extreme difficulties in maintaining concentration, persistence, and pace.[5] (R. 582.) Dr. Durr opined that Plaintiff would be absent from work about two days per month as a result of her major depressive and generalized anxiety disorders. (R. 583.)

Plaintiff continued to seek treatment for her depression in September and October 2009. In September, Dr. Durr's notes indicate that Plaintiff's mood was "ok," but she continued to display a constricted affect. (R. 627, 629.) Dr. Durr again diagnosed Plaintiff with major depression and generalized anxiety disorders and prescribed Prozac and Clonazepam. *Id.* A month later, Dr. Durr assessed Plaintiff's mood as being "alright" and continued her treatment plan. (R. 626.)

---

[4] An individual is seriously limited, but not precluded from performing a work activity when she "is seriously limited and [has] less than satisfactory" performance, but is not precluded from performing the activity in all circumstances. (R. 580.)

[5] A marked limitation "means more than moderate but less than severe" and arises "when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis." (R. 582.)

*(3) Plaintiff's Testimony*

At the administrative hearing, Plaintiff testified that, in February 2007, she was attacked and poked in both of her eyes. (R. 56-57.) As a result of the assault, she had four surgeries on her left eye, which included a corneal transplant and repair of multiple retinal detachments. (R. 57-58.) She explained she has no vision in her left eye and wore glasses to correct her vision in her right eye and to protect it. (46-47.) Plaintiff described having limited peripheral vision and being sensitive to light, and she could not go outside on a bright, sunny day because her eyes would become painful even when she wore sunglasses to protect them. (R. 48-51, 95-96.) She also stated that, on the day of the hearing, she was having a "hard time" with the lighting in the hearing room. (R. 51.)

Plaintiff testified she had a number of limitations stemming from her left eye impairment. For example, she would often bump into, trip, and fall over things in her house, including her dog. (R. 51-52, 93-94.) Plaintiff described having difficulty going up and down stairs; she must take her time, look down, hold the handrail, and take one step at a time so that she does not miss a step and fall down. (R. 51, 92-93.) She is able to drive around town, but she cannot drive very far, on the expressway, at night, or in the rain. (R. 51, 61, 69-70.) Plaintiff stated she is able to read, but she must bring the reading material "right [up] to [her] face" and, after reading for 10 minutes, she gets a headache. (R. 52, 94-95.) She is also not able to concentrate on "things" for very long because she is unable to see. (R. 95.)

Plaintiff explained that Dr. Blair treated her on a regular basis and she was scheduled for surgery to correct another retinal detachment. (R. 58.) She was suppose to see Dr. Blair every few months, but she had not seen him in four months because she did not have medical insurance and could not afford to pay for treatment herself. (R. 58-60.) Plaintiff testified that Dr. Lee performed

her corneal transplant surgery, but she did not treat her after the surgery. (R. 58-59.) The only medication Plaintiff took for her eye impairment was steroid drops that Dr. Blair prescribed for daily use. (R. 59.)

Regarding her depression, Plaintiff stated she felt depressed after her corneal transplant surgery because she needed additional surgeries and her eyesight was "not coming back." (R. 56, 60.) Plaintiff's mother initially helped her to deal with her depression, but in July 2009, she began seeing Dr. Durr every two weeks. (R. 60-61, 65-66.) Dr. Durr prescribed Prozac and later increased the dosage. (R. 67.) Plaintiff explained that Prozac helped her to more easily deal with her daily activities. (R. 69.) She had also previously attended family counseling in 2008, but the individual who provided the counseling only listened and did not provide any type of treatment. (R. 62-64.)

Plaintiff next testified she had a painful back and the epidural steroid injections she received in the past were not effective in alleviating her pain. (R. 53-54.) She explained she should have had back surgery and she walked with a cane. (R. 54, 97.) Plaintiff was last treated for back pain by Dr. Levin in 2007, but she no longer saw a doctor for her back pain because she did not have medical insurance. (R. 54-55.) She stated her back pain caused her certain limitations, including an inability to sit in one place for too long or stand in one place for more than 15 minutes. (R. 55.) But when Plaintiff moved around, she did not hurt as much. *Id.*

Plaintiff also provided testimony regarding her daily activities. She explained she had just recently moved in with her disabled mother and, before that, she would often visit her mother, who lived about five minutes away by car, every few days. (R. 71, 75-76.) Plaintiff was able to do her laundry, but she had difficulty navigating the stairs and would often stay in the basement and watch

television until her laundry was done. (R. 74.) She described being able to do household chores "slowly" and "tiring easily" from them, which often required her to lie down early in the evening. (R. 78-79, 94.) Plaintiff explained she would occasionally visit friends that lived near her, but she was no longer able to go to church, participate in hobbies, and go out at night. (R. 75-77.) She further indicated her back problems made it difficult for her to walk. (R. 96.)

### (4) Medical Expert's Testimony

At the administrative hearing, Dr. Walter Miller, a medical expert, testified about Plaintiff's eye and back impairments. He first explained that Plaintiff's vision in her right eye was normal, but her left eye was impaired to such an extent that she could only see light with that eye. (R. 97-98.) He stated that her back pain stems from degenerative disc disease, but there was no medical evidence of nerve root impairment. (R. 98-99.) After considering the medical record, Dr. Miller concluded that Plaintiff's eye and back impairments did not meet or equal any listed impairment and she was capable of performing light work. *Id.* With respect to her left eye impairment, Dr. Miller explained the problem Plaintiff was having with only one functioning eye was a psychological adjustment, which was documented by the record. (R. 100.) Regarding her ability to work, Dr. Miller stated that Plaintiff should not be working in a factory setting around hazardous machinery or fast moving parts. (R. 101.) He also indicated that, in a work setting, she might need to turn her head to adjust to limited peripheral vision and, if she could not do so, an employer would need to accommodate her. (R. 100.) Furthermore, Dr. Miller opined that, even though she was sensitive to light, he did not think Plaintiff would have many problems in the workplace in an "ordinary room with ordinary light." (R. 97, 103.)

13

*(5) Vocational Expert's Testimony*

Ruben Luna, a vocational expert, also testified at the administrative hearing. He first explained that Plaintiff's past relevant work as a secretary was classified in the Dictionary of Occupational Titles ("DOT") as sedentary-level work, but she actually performed that work at the medium exertional level. (R. 106-09.) The ALJ then posed a series of hypothetical questions to Mr. Luna to determine if there were any jobs in the national economy that Plaintiff could perform. The relevant hypothetical question herein required Mr. Luna to assume an individual with Plaintiff's vocational profile who was able to perform light work, but who had no visual depth perception, only occasional field of vision, and constant or frequent visual accommodation. (R. 114-15.) This hypothetical individual could never climb ladders, ropes, and scaffolds, could occasionally climb ramps and stairs, could frequently stoop, bend, crouch, and squat, but must avoid even moderate exposure to ordinary workplace hazards. (R. 114.) Based on these limitations, the ALJ asked Mr. Luna if this individual could perform her past relevant work. (R. 115.) Mr. Luna responded stating Plaintiff could perform her past work as a secretary as described in the DOT, but not as she had previously performed it. (R. 115-116.)

Mr. Luna next testified if the hypothetical individual's vision were limited to only rare accommodation then that individual could not perform the secretary job as described in the DOT because the job requires frequent visual accommodation.[6] (R. 118-20.) However, Mr. Luna identified three unskilled light jobs requiring no visual accommodation that the hypothetical individual could perform: room service clerk, packager, and cafeteria attendant. (R. 116-21.)

---

[6] Mr. Luna initially testified that Plaintiff could perform her past work as a secretary, but subsequently determined that he was mistaken because the secretary job as described in the DOT requires frequent visual accommodation rather than rare accommodation. (R. 118-20.)

Furthermore, when questioned by Plaintiff's attorney, Mr. Luna testified if the hypothetical person were limited to simple, routine tasks because her treating psychiatrist believed she is unable to meet competitive standards to carry out, understand, and remember detailed instructions, or deal with the stress of semiskilled and skilled work, that individual could still perform the packager and cafeteria attendant jobs as they are repetitive, short-cycle jobs. (R. 121-22.) Additionally, Mr. Luna explained if an individual would be off task more than 10 percent of a workday, that individual's ability to perform the jobs he identified would be dependent on the particular employer. (R. 124-25.)

## C. Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one: the Court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether a plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, and the error is not harmless, the Court must reverse the decision regardless of the evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the Court "must do more than merely rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted). In order for the Court to affirm a denial of benefits, the ALJ must have articulated the reasons for the decision at "some minimal level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." *Id.* Although an ALJ need not address every piece of evidence, the ALJ cannot limit her decision to only that evidence which supports her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the Court to assess the validity of her findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## D. Five-Step Inquiry

To qualify for SSI under Title XVI, a claimant must establish that she has a disability within the meaning of the Act. 42 U.S.C. § 1382c(a). An individual is "disabled" if she has an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations set forth a five-step sequential inquiry for determining whether a claimant is disabled. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted).

An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 416.920; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant—in light of her age, education, job experience and RFC to work—is capable of performing other work and that such work exists in the national economy. 20 C.F.R. § 416.920(f).

### E. Analysis

Plaintiff challenges a number of aspects of the ALJ's decision. She first argues that the ALJ mischaracterized her major depressive and generalized anxiety disorders as non-severe impairments because she improperly weighed the medical opinions. Plaintiff next claims that the ALJ's RFC finding was flawed because she misapplied the treating physician rule and did not consider the full impact her mental, physical, and visual limitations would have on her ability to work. She also asserts that the ALJ improperly assessed her credibility because the ALJ did not consider important aspects of her testimony and improperly evaluated the credibility of her testimony after she developed the RFC finding. Finally, Plaintiff contends that the ALJ's step five finding was flawed because the hypothetical questions posed to the vocational expert did not account for all of her limitations. The Court now considers each of the asserted grounds for remand.

**(1)** *Residual Functional Capacity*

Plaintiff contends that the ALJ made a number of reversible errors in assessing her RFC. (Pl.'s Br. at 8-16.) She asserts that the ALJ improperly weighed the medical opinions, misapplied the treating physician rule, and mischaracterized the severity of her GAF scores. *Id.* Plaintiff specifically argues that the ALJ erred by crediting Dr. Mehr's February 2008 opinion over that of her treating psychiatrist, Dr. Durr's September 2009 opinion, because Dr. Mehr's opinion did not take into account Dr. Durr's diagnoses of major depressive and generalized anxiety disorders and her mental health treatment history. *Id.* at 8-13. She next avers that the ALJ also erred by crediting the opinion of Dr. Lee, who performed only one of her eye surgeries, over that of Dr. Blair, who performed two eye surgeries, and treated her on a regular basis. *Id.* at 15-16. Furthermore, according to Plaintiff, the ALJ failed to consider her back pain and its impact on her ability to sit, stand, and walk in a work setting, which required an accommodation in the form of a sit/stand option. *Id.* at 13-14.

The Commissioner responds that the ALJ's RFC finding is supported by substantial evidence because she properly considered all of the relevant evidence in the record. (Def.'s Mem. at 11-16.) The Commissioner defends the ALJ by arguing that she reasonably weighed the medical opinions and concluded Dr. Durr's opinion was entitled to minimal weight because, for example, it was neither supported by appropriate narrative detail nor her own treatment notes, and there were conflicts between Plaintiff's own statements and Dr. Durr's opinion. *Id.* at 11-14. The Commissioner next asserts that the ALJ accorded Dr. Lee's opinion greater weight than that of Dr. Blair because Plaintiff's visual impairment was reasonably accommodated by Dr. Lee's limitations and Dr. Blair cited no specific objective findings to support his opinion. *Id.* at 15-16. Finally, the

Commissioner argues that the ALJ reasonably found that Plaintiff did not require an accommodation for a sit/stand option because the medical evidence did not support her allegations regarding the severity of her back pain and corresponding limitations. *Id.* at 14-15.

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. § 416.945(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. § 416.945(a)(3). According to the regulations:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7. Although an ALJ is not required to discuss every piece of evidence, she must consider all of the evidence that is relevant to the disability determination and provide enough analysis in her decision to permit meaningful judicial review. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Young,* 362 F.3d at 1002. In other words, the ALJ must build an "accurate and logical bridge from the evidence to h[er] conclusion." *Scott*, 297 F.3d at 595 (citation omitted).

In her decision, the ALJ gave "minimal weight" to Dr. Durr's September 2009 opinion that Plaintiff was unable to meet competitive work standards in four different mental functional areas of unskilled work. (R. 29.) She first discounted Dr. Durr's opinion because it was a checklist

19

assessment that was based on "broad and conclusory opinions," which were "unsupported by any detail or narrative explanation." *Id.* Next, the ALJ determined that Dr. Durr's own treatment notes did not support "these broad restrictions with clinical findings." *Id.* The ALJ further discredited Dr. Durr's opinion because Plaintiff's GAF scores reflected "only mild to moderate limitations" in mental functioning despite the alleged ineffectiveness of Plaintiff's medications. *Id.*

An ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) it "is not inconsistent with the other substantial evidence" in the case. *See* 20 C.F.R. § 416.927(d)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). This rule takes into account the advantage the treating physician has in personally examining the claimant, while controlling any bias the treating physician may develop, such as a friendship with the patient. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). On the other hand, if well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. *Id.* at 376. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377. An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).

Whether the ALJ articulated good reasons for rejecting Dr. Durr's September 2009 opinion is somewhat of a close call, but one the Court resolves in Plaintiff's favor. First, contrary to the ALJ's contention that Dr. Durr's opinion regarding Plaintiff's ability to meet the competitive standards of unskilled work constitutes a broad conclusory opinion that is unsupported by an appropriate narrative explanation and Dr. Durr's own treatment notes and clinical findings, the

Court's review of Dr. Durr's medical documentation as a whole establishes that there is sufficient evidence to support her opinion. For example, the record consists of Dr. Durr's initial psychiatric evaluation, clinical findings, and treatment notes establishing the nature and severity of Plaintiff's major depressive and generalized anxiety disorders. Dr. Durr's initial psychiatric evaluation and progress notes document the numerous medical signs and symptoms attributable to Plaintiff's mental impairments, which include, for example, a depressed or irritable mood, anhedonia, decreased appetite, poor concentration, sleep disturbance, weight loss, frequent crying, constricted affect, and feeling worthless, hopeless, and helpless. (R. 626-27, 629-35.) Accordingly, Dr. Durr's opinion that Plaintiff suffers from various limitations in mental functioning is corroborated and supported by her treatment notes, clinical findings, diagnoses of major depression and generalized anxiety, and treatment regimen, which includes anti-depressant and anxiety prescription medications, and individual therapy.

As Plaintiff correctly points out, the ALJ did not articulate what aspects of Dr. Durr's treatment notes fell short of supporting her September 2009 opinion. (Pl.'s Br. at 13.) Here, the ALJ never discussed the specific medical signs, treatment plan, and diagnoses she believed failed to substantiate Dr. Durr's opinion that Plaintiff could not meet the competitive standards required to perform unskilled work. The Commissioner avers that a discussion of the treatment notes was not necessary because the ALJ generically cited to Dr. Durr's notes and characterized them as "fairly unremarkable." (Def.'s Mem. at 13-14, citing R. 25, 29.) Here, the Commissioner explains that the treatment notes show that, despite Dr. Durr's depression and anxiety diagnoses, on the seven occasions between July 2009 and October 2009 that she treated Plaintiff, Dr. Durr noted Plaintiff's mood ranged from "good" to "tired" to "ok" to "alright" and, at her last visit, she was only mildly

anxious.  *Id.* at 14, citing R. 626-27, 629-30.  But the Commissioner's defense of this aspect of the ALJ's decision relies on post-hoc rationalizations because she never articulated these reasons for discrediting Dr. Durr's opinion. Thus, the Commissioner's after-the-fact contention is not a substitute for the ALJ's analysis.  *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

The ALJ also improperly discounted Dr. Durr's September 2009 opinion because she mischaracterized Plaintiff's GAF scores.  In her decision, the ALJ stated that Plaintiff's current GAF score of 50 and past year GAF score of 60, which Dr. Durr herself assessed, reflected "only mild to moderate limitations" in mental functioning.  (R. 24, 29.)  But here the ALJ was wrong because a GAF score ranging from 41 to 50 indicates serious symptoms or impairments and a GAF score ranging from 51 to 60 indicates moderate symptoms or impairments.  DSM-IV-TR at 34.  Even though the ALJ was not bound by Dr. Durr's GAF scores in assessing the extent of Plaintiff's disability as they are not definitive of disability, Plaintiff's GAF score of 50 constitutes objective evidence that would seem to support Dr. Durr's opinion that Plaintiff is unable to meet competitive standards in a number of mental functioning areas of unskilled work.  *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) ("A GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that [the plaintiff] was mentally capable of sustaining work"); *Walker v. Astrue*, No. 10 C 7239, 2011 WL 4639841, at *14 (N.D. Ill. July 13, 2011) ("While not dispositive, '[t]he GAF scale reports a clinician's assessment of the individual's overall level of functioning,' and '[a] GAF of 50 indicates serious symptoms or functional limitations'").

Accordingly, when considering the record as a whole, the reasons the ALJ gave for rejecting Dr. Durr's opinion do not constitute good reasons. *Martinez*, 630 F.3d at 698.

Besides failing to offer good reasons for discounting Dr. Durr's opinion, the ALJ also unreasonably credited the opinion of Dr. Mehr, the state agency reviewing psychologist, over that of Dr. Durr. The ALJ accorded "great weight" to the opinion of Dr. Mehr, who concluded that Plaintiff had no limitations stemming from her alleged depression. (R. 24-25.) But the problem with the ALJ's reliance on Dr. Mehr's opinion is that Dr. Mehr's assessment of Plaintiff is based on a limited review of the record because he did not have the benefit of reviewing Dr. Durr's clinical findings, treatment notes, diagnoses, and September 2009 opinion. Here, Dr. Mehr rendered his assessment in February 2008, more than 16 months *before* Dr. Durr treated Plaintiff and diagnosed her with major depressive and generalized anxiety disorders. (R. 543-56, 578-83, 626-27, 629-35.) Dr. Mehr specifically found, in February 2008, that there was no medical evidence in the record to substantiate Plaintiff's allegation that she suffered from depression because she had neither been diagnosed with depression nor received any type of treatment for depression. (R. 546, 555.) Because Dr. Mehr never had an opportunity to review Dr. Durr's clinical findings, treatment, and assessment documenting the nature of Plaintiff's major depressive and anxiety disorders, his opinion is not comprehensive and does not contradict Dr. Durr's assessment. Thus, it was improper for the ALJ to reject Dr. Durr's opinion without any contrary contemporaneous medical evidence. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."). Here, Dr. Durr's opinion was the "most recent professional word" on Plaintiff's mental impairments by a treating psychiatrist that provided

the most "comprehensive picture" of her mental health that was available at the time of the hearing. *See e.g., Jelinek v. Astrue*, 622 F.3d 805, 812 (7th Cir. 2011) (the ALJ would have been "hard pressed to justify casting aside" the treating psychiatrist's opinion in favor of the earlier state agency physicians' opinions that were nearly two years old).

While the Commissioner contends that the ALJ appropriately gave Dr. Mehr's opinion "great weight" because she reasonably found that there were conflicts between Plaintiff's own statements and Dr. Durr's opinion, the Court does not agree. (Def.'s Mem. at 14.) To support his contention, the Commissioner points out that the ALJ appropriately relied on Plaintiff's ability to engage in daily activities and Plaintiff's mother's responses in a November 2007 activities questionnaire in which she indicated Plaintiff had no problem with personal care, did not need reminders or encouragement, got along with family members and friends, and had no problem with memory, concentration, understanding and following directions, and completing tasks. *Id.* citing R. 24-25, 300-07. But here the ALJ never explained why she found Plaintiff's daily activities or her ability to engage in those activities reported by her mother as being inconsistent with her claim of disabling depression. *See e.g., Clifford*, 227 F.3d at 870 (holding that "[t]he ALJ did not provide any explanation for his belief that [the plaintiff's] activities were inconsistent with [her treating physician's] opinion and his failure to do so constitutes error.") Furthermore, Plaintiff's limited daily activities do not constitute substantial evidence sufficient to outweigh a treating physician's report. *See e.g., Patterson v. Barnhart*, 428 F.Supp.2d 869, 882, 884 (E.D. Wis. Apr. 12, 2006) (an individual can function in a volunteer job, live in a dorm, and visit his mother and still have a disabling mental impairment); *Elbert v. Barnhart*, 335 F.Supp.2d 892, 910 (E.D. Wis. 2004) (an

individual can maintain contact with family and friends and yet have a disabling mental impairment).[7]

Even if the ALJ had articulated good reasons for refusing to give the opinion of Dr. Durr controlling weight, the ALJ still would have been required to determine what weight the assessment did merit. *See* 20 C.F.R. § 416.927(d); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. *Moss v. Astrue,* 555 F.3d 555, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). But here the ALJ never discussed these factors in assessing what weight to accord Dr. Durr's opinion. That constitutes reversible error. *See Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (case reversed in part because the ALJ failed to specifically explain the basis for the weight given to the treating physician's opinion).

Plaintiff next persuasively argues that the ALJ improperly credited Dr. Lee's May 2008 opinion over of Dr. Blair's March 2009 opinion.[8] (Pl.'s Br. at 15-16.) In her decision, the ALJ accorded "greater weight" to Dr. Lee's opinion because it was more specific than the opinions of the state agency consultants, and she gave "minimal weight" to Dr. Blair's opinion because it both

---

[7] The ALJ's reliance on Plaintiff's mother's responses to the September 2007 activities questionnaire is misplaced because Plaintiff was not diagnosed with major depressive and anxiety orders and treated for these illnesses until July 2009.

[8] The ALJ refers to Dr. Lee as Plaintiff's corneal transplant surgeon, but the record appears to indicate that Dr. Blair performed Plaintiff's corneal transplant surgery and Dr. Lee performed one of Plaintiff's retinal detachment surgeries. (R. 619-24.)

contrasted with Dr. Lee's opinion and there was "no support or specific objective findings cited for [Dr. Blair's] broad and conclusory limitations." (R. 29.) The ALJ adopted Dr. Lee's opinion regarding Plaintiff's visual limitations and also credited his view that Plaintiff's symptoms would never interfere with her attention and concentration during a typical workday, and she would never need to take unscheduled breaks. (R. 29, 573.) Dr. Blair, on the other hand, recommended some stricter visual limitations and opined that Plaintiff would occasionally need to take unscheduled breaks during the workday for "a few minutes" due to "ocular irritation" and indicated her symptoms were severe enough to occasionally interfere with her attention and concentration. (R. 29, 575, 576.)

Here, the ALJ failed to offer a good reasons for discounting Dr. Blair's March 2009 opinion. The ALJ's statements that Dr. Blair's opinion contrasted with Dr. Lee's opinion and her view that Dr. Blair's expressed limitations are broad, conclusory, and unsupported by the record are not specific enough to allow this Court to understand her reasoning for discrediting Dr. Blair's opinion. *See* 96-2p, 1996 WL 3741888, at *5 (explanations regarding the weight given to a treating source's medical opinion "must be sufficiently specific to make clear . . . the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). The ALJ also failed to analyze the required factors in assessing what weight to give Dr. Blair's March 2009 opinion. *See Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not entitled to controlling weight "the checklist comes into play"). As stated, the ALJ must consider the "length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561. Here, many of these considerations seem to favor crediting Dr. Blair's opinion: he is a specialist, he performed two of Plaintiff's eye surgeries, and he treated Plaintiff on

a number of occasions. (R. 377-79, 448-49, 452-53, 456-57, 458-59, 460-61, 622-24.) In contrast, Dr. Lee, who is also a specialist, performed only one surgery, treated Plaintiff on only one occasion, and instructed Plaintiff to seek follow-up treatment with Dr. Blair. (R. 58-59, 443, 619-20.) But here the ALJ never employed the "checklist" factors in explaining her reasoning for according "greater weight" to Dr. Lee's opinion.

The Commissioner, however, contends that the ALJ reasonably discounted Dr. Blair's opinion based on the testimony of the medical expert. (Def.'s Mem. at 16.) The Commissioner explains that, after considering all of the record evidence, Dr. Miller testified that Plaintiff's vision impairment would only limit her ability to work around hazardous machinery and fast moving parts. *Id.,* citing R. 100-01. However, an ALJ is not allowed to reject the opinion of a treating physician based only on the testimony of a medical expert. *See Gudgel*, 345 F.3d at 470 ("a contradictory opinion of a non-examining physician does not, by itself, suffice"). Additionally, the Commissioner asserts that the ALJ properly discredited Dr. Blair's opinion because Plaintiff was "fairly able to function visually at the hearing" and her alleged tripping over things showed "an adjustment rather than a durational impairment because she admitted she could see a person peripherally and even discerns the person's race, but not the details, and she further admitted she has to 'learn to look down.'" *Id.*, citing R. 30. But here the ALJ appears to be "playing doctor" by characterizing Plaintiff's eye impairment as a "durational impairment" because no physician has expressed that opinion. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

Lastly, Plaintiff argues that the ALJ erred by not addressing her pain limitations stemming from her degenerative disc disease when she assessed her ability to perform light work. (Pl.'s Br.

at 13-14.)  Specifically, Plaintiff claims her testimony that she could not sit in one place for very long, stand in one place for more than 15 minutes, and must move around at times raises the issue of whether she would require a sit/stand option to accommodate her need to alternate between sitting, standing, and walking in a work setting.  *Id.*  But here Plaintiff's argument is weak because she has presented no evidence to support her contention that the ALJ should have incorporated a sit/stand option in her RFC finding.  While the record establishes that Plaintiff suffers from back pain stemming from degenerative disc disease, no physician has opined that she requires an accommodation to alternate between sitting and standing in a work setting.  Because Plaintiff has the burden of proof and has failed to establish that she requires such any accommodation, the Court declines to remand the case on this issue.  *See e.g., Briscoe*, 425 F.3d at 352; *see also* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").

Based on the shortcomings in the ALJ's consideration of the opinions of Dr. Durr and Dr. Blair, the ALJ's decision lacks a basis for concluding that she applied the correct legal standard. In discounting Dr. Durr's and Dr. Blair's opinions, the ALJ appears to have selected only those pieces of evidence that favored her ultimate conclusion.  *Binion*, 108.F.3d at 788-89; *Herron*, 19 F.3d at 333.  On remand, the ALJ shall reevaluate the weight accorded to Dr. Durr's and Dr. Blair's opinions.  If the ALJ cannot identify well-supported evidence contradicting these opinions, then the ALJ must give those opinions controlling weight.  *See* 20 C.F.R. § 416.927(d)(2).  If good reasons do exist for discounting their opinions, the ALJ must apply the factors listed in § 416.927(d) when deciding what weight to give those opinions.  Accordingly, because the ALJ has not constructed an

accurate and logical bridge between Plaintiff's impairments, supported by substantial evidence in the record, and the RFC assessment, a remand on this issue is warranted. *See e.g., Clifford*, 227 F.3d at 871 ("an ALJ must consider "*all* relevant evidence" and may not analyze only that information supporting the ALJ's final conclusion) (emphasis in original); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments . . . and may not dismiss a line of evidence contrary to the ruling.").[9]

### (2) *Credibility*

Plaintiff argues that the ALJ made a number of reversible errors in assessing the credibility of her testimony. (Pl.'s Br. at 16-17.) Specifically, she claims that the ALJ did not appropriately discuss many aspects of her testimony. *Id.* at 17. Here, Plaintiff points out that the ALJ did not consider the credibility of her testimony regarding her need to alternate between sitting, standing, and walking as a result of her lower back pain or her testimony that she is unable to read for more than 10 minutes because she cannot concentrate due to her vision problems. *Id.* Plaintiff further argues that the ALJ erred by using the boilerplate wording criticized by the Seventh Circuit, which

---

[9] Plaintiff asserts the ALJ erred at the step two determination because she found that her major depressive and generalized anxiety disorders constituted non-severe impairments. (Pl.'s Br. at 8-12.) But here the ALJ also found that Plaintiff's degenerative disc disease and eye impairment constituted severe impairments, which caused her to proceed to step three of the sequential analysis. (R. 23.) In assessing Plaintiff's RFC, the ALJ was required to consider both Plaintiff's severe and non-severe impairments. *See Golembiewski*, 922 F.3d at 918 ("Having found that one or more of [the claimant's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of the entire constellation of ailments—including those impairments that in isolation are not severe."). Because the ALJ proceeded beyond step two, and considered Plaintiff's severe and non-severe impairments at step four, any error at the step two determination was harmless. *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("[d]eciding whether impairments are severe at Step 2 is a threshold issue only").

resulted in the ALJ assessing the credibility of her testimony after she developed the RFC finding. *Id.* at 16-17.

The Commissioner, however, defends the ALJ's credibility finding, asserting that it is not "patently wrong." (Def.'s Mem. at 16-18.) Here, the Commissioner contends the ALJ evaluated the credibility of Plaintiff's testimony and determined it was not "very credible" based of the record evidence and her own personal observations at the hearing. *Id.* The Commissioner next asserts that the ALJ properly assessed the credibility of Plaintiff's testimony before she developed the RFC finding because she thoroughly articulated her credibility finding. *Id.* at 17. Thus, according to the Commissioner, the ALJ appropriately discussed the relevant credibility factors in her decision and concluded that Plaintiff's testimony did not support her allegations of disabling limitations. *Id.* at 17-18.

An ALJ's credibility finding will be afforded "considerable deference" and will be overturned only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted). "A credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and so the court has greater freedom to review it. *Craft*, 539 F.3d at 678.

In assessing an individual's credibility, the ALJ must weight the claimant's subjective complaints, relevant objective medical evidence, and evidence of the following factors including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of your pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and

side effects of any medication; (5) treatment, other than medication, for relief of pain or other symptoms; (6) other measures taken to relief pain or other symptoms; and (7) other factors impacting functional limitations resulting from pain or other limitations. 20 C.F.R. § 416.929(c)(3). SSR 96–7p specifically requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir.2007) (citation omitted).

An ALJ's credibility finding will be upheld if the reasons for that finding are supported by substantial evidence. *Moss*, 555 F.3d at 561. Under SSR 96-7p, the written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186, at *2. Without an adequate explanation, neither the claimant nor subsequent reviewers will have a fair sense of how the claimant's testimony is weighed. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001). Therefore, where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," an ALJ's credibility determination will not be upheld. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996).

To the extent Plaintiff argues she is entitled to a remand because the ALJ failed to discuss her testimony that she cannot read for more than 10 minutes and she is unable to concentrate for very long because she has difficulty being able to see, the Court agrees with Plaintiff. The ALJ did not address why she found these aspects of Plaintiff's testimony not credible and Dr. Blair

specifically opined that Plaintiff's symptoms stemming from her vision impairment were severe enough to occasionally interfere with attention and concentration needed to perform even simple work tasks. (R. 576.) Furthermore, to the extent the ALJ relies on Plaintiff's daily activities to discredit her testimony, Plaintiff's daily activities are fairly limited and not the type that would contradict her claims of disabling allegations. (R. 51, 61, 69-70, 74-79, 94.) *See e.g., Clifford*, 227 F.3d at 872 (noting "minimal daily activities ... do not establish that a person is capable of engaging in substantial physical activity"). Accordingly, a remand on these credibility issues is warranted.

**(3) *Step Five***

Finally, the Court does not need to reach Plaintiff's contention that the ALJ rendered an improper step five finding because the Court is remanding this case for errors in the ALJ's application of the treating physician rule as well as errors in her RFC and credibility findings. On remand, the ALJ must propound new hypothetical questions to the vocational expert taking into account *all* of Plaintiff's limitations that are supported by the medical evidence. *See Indoranto v. Barnhart*, 374 F.3d 470, 470 (7th Cir. 2004).[10]

---

[10] The Commissioner contends that the ALJ did not err at step five because Mr. Luna, the vocational expert, identified unskilled packager and cafeteria attendant jobs, which would accommodate an individual who was limited to rare visual accommodation and simple, routine tasks and simple instructions. (Def.'s Mem. at 18-19.) But the ALJ did not include Plaintiff's mental functional limitations in any of the hypothetical questions she posed to Mr. Luna and the questions Plaintiff's attorney's posed to Mr. Luna did not incorporate all of the limitations opined by Dr. Durr. (R. 121-22.) Furthermore, while the packager and cafeteria attendant jobs accounted for Dr. Blair's limitation that Plaintiff could rarely perform activities involving accommodation of her left eye, they neither accounted for his opinion that Plaintiff would need to occasionally take unscheduled breaks during an eight-hour workday for "a few minutes" because of "ocular irritation" nor did they take into consideration his opinion that Plaintiff's symptoms were severe enough to occasionally interfere with attention and concentration needed to perform even simple work tasks. (R. 575-76.)

**CONCLUSION**

For the foregoing reasons, the ALJ's decision and the Commissioner's subsequent denial of Plaintiff's SSI benefits are reversed, and this case is remanded with instructions to return the matter to the Social Security Administration for further proceedings consistent with this Opinion.

SO ORDERED on March 26, 2013.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE